UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

ELAINE CHAMBERS,                        )
                    Plaintiff,          )
                                        )
        vs.                             )          1:08-cv-1395-LJM-JMS
                                        )
MIDWEST INDEPENDENT                     )
TRANSMISSION SYSTEM OPERATOR,           )
INC.,                                   )
                    Defendant.          )


**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on defendant's, Midwest Independent Transmission System Operator, Inc. ("Midwest ISO"), Motion for Summary Judgment. Plaintiff, Elaine Chambers ("Chambers"), alleges that Midwest ISO retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and The Civil Rights Act of 1866, 42 U.S.C. § 1981.  For the following reasons the Court concludes that Midwest ISO's Motion for Summary Judgment is **DENIED in part and GRANTED in part**.


**I. BACKGROUND**

Prior to approximately April 30, 2007, Chambers was employed by Midwest ISO, a nonprofit independent transmission system operator that provides bulk power transmission services to facilitate a wholesale energy market, in the position of Senior Manager of Market Settlements.   Pl.'s Ex. 31 ¶ 1; Def.'s Ex. 1 ¶ 4; Def.'s Ex. 13 ¶ 10.

In November 2006, Midwest ISO posted openings for the position of Market Settlements Analyst. Def.'s Ex. 3 at 53. Initially, in November 2006, the job posting was listed under job numbers 707 and 708. *Id.* Additionally, the initial posting indicated that the position had a salary grade of twenty-two. *Id.* The person occupying the position would answer to Chambers. *Id.* In January 2007, the Midwest ISO Job Evaluation Committee approved a five-tiered salary range for analyst positions that spanned salary grades twenty-one through twenty-five. *Id.* at 31, 53-54. There is some dispute as to whether this new salary information was disseminated with respect to all of the job numbers falling under the title "Market Settlement Analyst," particularly job numbers 707 and 708. Pl.'s Resp. at 3-4. It is clear that the salary information was, however, released for job number 657 pursuant to an email that identified only job number 657 in its subject line. Pl.'s Ex. 4. Pursuant to its policy, Midwest ISO re-posted an available analyst position, indicating only job number 657, at the modified salary grade on January 11, 2007. Pl.'s Ex. 6. Job numbers 707 and 708 were not re-posted. *Id.* Chambers claims to have been under the impression, as a result of indications by Lori Spence, Midwest ISO's counsel, as well as its human resources department, that when changes are made to a posted position the position must be re-posted to indicate the changes. Pl.'s Ex. 5.

On March 16, 2007, Chambers interviewed an internal candidate for the position of Market Settlement Analyst. Pl.'s Ex. 9. The candidate, James Ridley, an African American, had applied and been asked to interview for job number 708. *Id.* Ridley was at a salary grade of twenty in his current position. Def.'s ex. 8 ¶ 6. During the interview, Chambers told Ridley that the job had a salary grade of twenty-two. Def.'s Ex. 2 at 28. Although Chambers was ready to hire Ridley for her department, both the vice president of Ridley's

current department and the vice president of the department to which Ridley would be transferring were required to review and approve the proposed offer.  Def.'s Ex. 8 ¶ 4. Pursuant to that policy, Chambers submitted a "personnel requisition form" on his behalf, requesting that she be permitted to bring him on at a salary grade of twenty-two with an annual salary of $57,500.  *Id.* ¶ 7.

Around the time that Chambers sought to promote Ridley, she spoke with Eric Huffine ("Huffine"), Ridley's manager, about racial discrimination involving Ridley.  Pl.'s Ex. 26 at 15.  He told Chambers that he had witnessed Jim Schinski ("Schinski"), the vice president of Ridley's current department, discriminate against Ridley in the past.  *Id.* Further he told Chambers that Ridley had been denied job opportunities because of his race and, more generally, he informed Chambers that he believed Ridley was being discriminated against on the basis of his race.  *Id.*  Schinski, did not approve Chambers' request at salary grade twenty-two, but he was willing to grant the transfer at a lower salary grade.  Def.'s Ex. 8 ¶ 9.

Chambers concluded from her discussion with Huffine that Schinski did not approve Ridley's promotion at the higher salary grade because of his race, and allegedly complained to Vice President of Market Operations Richard Doying ("Doying"), Director of Settlements and Transmission Pricing Mark Volpe ("Volpe") and Manager of Recruiting and Workforce Planning, Mike Begley ("Begley") that she believed Midwest ISO was racially discriminating against Ridley.  Pl.'s Ex. 26 at 20; Pl.'s Ex. 31 ¶¶ 6-9.  Following those conversations, on March 29, 2007, Chambers sent an email to Begley with copies to Doying and Volpe outlining the situation, but never explicitly mentioned race or racial discrimination.  Pl.'s ex. 10.  In the email, she said that by hiring Ridley at a grade twenty-

3

one salary and limiting his raise to no more than six percent, "[w]e would be treating [Ridley] differently than any other candidate we have ever offered, paying him far less money . . . and giving [him] a grade lower than every other Market Settlements Analyst with the same qualifications." *Id.* Chambers went on to state: "Based on the restrictions placed on this opportunity for [Ridley], I would like to make an offer to another candidate. I cannot in good faith treat [Ridley] in this manner." *Id.*

The parties dispute whether this email was understood by its recipients to be complaining of racial discrimination. Substantively, Midwest ISO claims that the email merely illustrated Chambers' lack of comprehension regarding the salary range available for the position for which Ridley had applied and her weak grasp on Midwest ISO's internal promotions policy. See Def.'s Br. at 6-7. As it pertains to the actions taken against Chambers, Midwest ISO claims to be troubled solely by Chambers' "tone and tenor" in the email. Def.'s Ex. 11 at 52, 55-57. After outlining Chambers' history of less than polished people skills as documented through her performance evaluations, Def.'s Ex. 1; Def.'s Ex. 2; Def.'s Ex. 3, Midwest ISO notes that Doying, who had been copied on the email, felt as though it was "not intended to resolve an issue," but instead was intended to be "accusatory and inflammatory." Def.'s Ex. 11 at 55-57. Further he felt that both emails were "unprofessional." *Id.* In particular, Doying was troubled by the end of the email quoted above because he felt that Chambers was implying that she was being forced to treat Ridley unfairly because of a mistake that Human Resources had made. *Id.* In short, Midwest ISO claims that Doying read the email primarily as Chambers shifting blame away from herself in an unprofessional manner, and that Doying read nothing into it regarding allegations of racial discrimination on the part of Midwest ISO.

4

Conversely, Chambers claims that in the context of her conversations with Doying, Volpe, and Begley regarding her suspicions of racial discrimination against Ridley, they understood her email to be a complaint regarding racial discrimination.  As evidence, she points to a phone call Volpe received from Doying immediately following his receipt of the email during which Doying declared that Chambers had accused the IT Department of "being a racist organization," and further that when Volpe returned from vacation, he and Doying would have to address the situation.  Pl.'s Ex. 25. at 27.  Doying allegedly also told Volpe that the statement "we'd be treating [Ridley] differently . . ." put Midwest ISO at risk for a discrimination suit.  *Id.* at 28.

On April 4, 2007, Begley responded to the email.  Def.'s Ex. 8. at 6.  In his response, he outlined the unwritten internal promotions policy that generally limited salary increases to 6% and one grade increase and further explained the five tiered salary structure for analysts that Midwest ISO had implemented in late 2006.  *Id.*  Begley went on to say that he hoped that Chambers would reconsider withdrawing Ridley's name from consideration, and that he would be eligible for review within six months when he could be raised to a salary grade of twenty-two.  *Id.*  On the same day, Chambers responded to Begley's email stating that "[w]hatever the company decides to do is fine with me.  However I do need to correct at least [two] items."  Def.'s Ex. 12.  Chambers explained how she could not have known that job number 708 was not a grade twenty-two job as the posting indicated, and that it was her understanding that any time changes to a job posting were made the job must be re-posted.  *Id.*  She said that she had never seen job 708 re-posted with a new salary range and was "never told that the new salary ranges  are effective retroactively on jobs that have been posted since November 7, 2006."  *Id.*

5

On April 16, 2007, Chambers met with Teresa Shobe ("Shobe"), a Human Resources Generalist, Volpe, and Doying.  Def.'s Ex. 2 at 51.  In this meeting Chambers was disciplined for her communication with Begley and her prior history of "inappropriate communications."  Def's Ex. 2 at 137.  During the meeting, Chambers was placed on a Performance Improvement Plan ("PIP") and a Progressive Action Form ("PAF").  Pl.'s Ex. 13; Pl.'s Ex. 15.  The two documents primarily addressed Chambers' written and verbal communication skills and instructed that her communications must be "professional in nature" and "reflect a positive corporate image and reputation."  Pl.'s Ex. 13.  Chambers was also moved from her Senior Management of Market Settlements position to a Technical Manager of Market Services position.  Def.'s Ex 14 at 145-46.  The shift removed her human resources responsibilities.  *Id.*  However, she continued to report to the same supervisor and her salary grade did not change.  *Id.*  The meeting concluded with an admonition that it was not to be discussed with anyone other than those who participated in it, Chambers' husband, and legal, which included only Midwest ISO's legal department.  Pl.'s Ex. 29 at 5.

On April 18, 2007, Chambers filed a charge of discrimination with the EEOC.  Chambers alleged Midwest ISO disciplined her during the April 16 meeting specifically because she complained that Schinski refused to approve Ridley's transfer to Market Settlements because of Ridley's race.  Def.'s Ex. 17.

Following the meeting on April 16, Doying acquired information that indicated Chambers had discussed the meeting with another Midwest ISO employee, Veronica Davis Smith ("Davis Smith").  Pl.'s Ex. 27 at 17.  The parties dispute whether Chambers discussed the meeting with other employees of Midwest ISO.  Def.'s Ex. 11 at 117-19, 122-

6

26.  Additionally, the parties dispute whether Chambers discussed the meeting with Davis

Smith at all.  Pl.'s Ex. 31 ¶ 11.  On April 23, 2007, Midwest ISO placed Chambers on

administrative leave.  Def.'s Ex. 2 at 61.  Midwest ISO terminated Chambers on April 30,

2007.  Def.'s Ex. 11 at 43.  Midwest ISO claims that the leave and termination occurred as

a result of Chambers' failure to keep the meeting confidential from other Midwest ISO

employees.  Pl.'s Ex. 27 at 20.  Chambers alleges that Midwest ISO placed her on

administrative leave and terminated her because she filed a charge of discrimination with

the EEOC.  Compl. ¶¶ 30-32.  After her forced leave and termination, Chambers filed an

amended charge of discrimination with the EEOC on May 14, 2007.  Def.'s Ex. 18.


## II. <u>STANDARD</u>

As stated by the Supreme Court, summary judgment is not a disfavored procedural

shortcut, but rather is an integral part of the federal rules as a whole, which are designed

to secure the just, speedy, and inexpensive determination of every action.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City*

*of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990), *cert. denied*, 499 U.S. 923 (1991).

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil

Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine issue as to any material
> fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit.  *Johnson v. Cambridge*

*Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*.  Once a party has made a

properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory.  *Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party.  *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281

8

(7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

On certain occasions, the Seventh Circuit has suggested that a court approach a motion for summary judgment in an employment discrimination case with a particular degree of caution.  *See e.g., Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).  The language implied that summary judgment might be less appropriate in this context based upon the presence of issues of motive and intent.  *Holland*, 883 F.2d at 1312.  As the Seventh Circuit has emphasized, however, these cases do not establish a heightened summary judgment standard for employment-related cases.  Instead, the language from the prior cases simply means "that courts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be."  *Wallace v. SMC Pneumatics*, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).  Even when discriminatory intent is at issue, summary judgment is appropriate when the nonmovant presents no evidence to indicate motive or intent in support of her position.  *See Holland*, 883 F.2d at 1312.  Further, the nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support.  *See Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994).

### III. DISCUSSION

Chambers makes two claims regarding Midwest ISO's retaliation against her in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e and the Civil Rights Act of 1866, 42 U.S.C. § 1981.  First, she claims that Midwest ISO retaliated against her when it moved her to the "Technical Manager-Market Services" position as a result of her communication with Begley.  Second, Chambers claims that Midwest ISO retaliated against her for filing her initial EEOC charge when it placed her on administrative leave and terminated her employment.  The Court will address each alleged instance of retaliation in turn.

### A.  CHAMBERS' RETALIATION CLAIMS BASED UPON DISCIPLINE OCCURRING ON APRIL 16, 2007

A plaintiff may prove her retaliation claim via either the direct or indirect method of proof.  *See Brown v. Illinois Dep't Natural Res.*, 499 F.3d 675, 681 (7th Cir. 2007).  In this case, Chambers elects to proceed under the direct method of proof.  "The focus of the direct method of proof is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action."  *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2007) (quoting *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744 n.3 (7th Cir. 2006)).  Under the direct method, the plaintiff must show: "(1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two."  *Herron v. Daimler Chrysler Corp.*, 388 F.3d 293 (7th Cir. 2004).  The direct method of proof permits two types of evidence:  direct evidence and circumstantial evidence.  *See Tomanovich v. City of*

*Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  The former requires evidence that a decision maker had discriminatory animus.  The latter requires evidence of "a convincing mosaic of discrimination against the plaintiff."  *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  Generally, in retaliation cases this circumstantial evidence is comprised of suspicious timing, ambiguous statements or behavior toward other employees; evidence that similarly situated employees were treated differently; or evidence that the employee did not deserve termination and that the employer's reason for termination was pretext for discrimination.  *See Volovsek v. Wis. Dep't of Agric.*, 344 F.3d 680, 689-90 (7th Cir. 2003).

Midwest ISO claims that Chambers' email did not constitute a statutorily protected activity.  Chambers, however, alleges that her verbal complaints of discrimination against Ridley along with her March 29, 2007 email constitute "statutorily protected activity." Midwest ISO ignores the verbal complaints.  Instead, Midwest ISO focused on the March 29, 2007, email and argues that a jury could not reasonably believe that the complaints Chambers raised in the email were related to Ridley's race because Chambers never explicitly referenced Ridley's race.   Midwest ISO relies on *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841 (7th Cir. 2008), to bolster its claim that the March 29 email alone does not amount to a statutorily protected activity.   In that case, an employee of Indian descent emailed his supervisor and made reference to his immigrant status but admitted to not including his complaints about national origin discrimination in the email. Indeed, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  *Tomanovich*, 457 F.3d at 653.

11

However, there is no need for an employee to use magic words such as race or discrimination to engage in a statutorily protected activity. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000). Chambers must merely put forward "evidence from which it could be reasonably inferred that her employer more likely than not knew that she was concerned about [racial discrimination]." *Id.* (internal quotations and emphasis omitted). The March 29 email, if taken on its own, does complain in fairly general terms, but Chambers has not limited her offering of evidence of a statutorily protected activity to the email alone. When the email is combined with Chamber's deposition - testimony that she made verbal complaints about racial discrimination against Ridley to Begley, Volpe, and Doying - and Volpe's deposition - testimony that Doying reacted to the email by stating that he believed that it accused the IT department of being racist, there is a genuine question as to whether Midwest ISO "more likely than not" knew that Ridley was concerned with racial discrimination. *See id.*

Midwest ISO argues that this Court should not consider Volpe's deposition to the extent that it alleges statements made by Doying on the telephone regarding the implications of the March 29 email because, according to Midwest ISO, those statements are hearsay. Although it is true that hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997), Doying's statements to Volpe regarding the March 29 email are not hearsay. These statements are not offered to assert their truth but instead to illustrate Doying's state of mind regarding the March 29 email. Even if the statements were offered for their truth, they are non-hearsay by rule. Over the course of the telephone call, Doying, as an officer of Midwest ISO, spoke as an agent or servant of Midwest ISO

and the statement was made concerning a matter within his scope of employment during the existence of the employment relationship.  Therefore, the statements are admissible as admissions of a party-opponent.  Fed. R. Evid. 801(d)(2)(D); *see Germano v. Int'l Profit Ass'n*, No. 07-3914, 2008 U.S. App. LEXIS 19990 (7th Cir. September 12, 2008) (noting that statements over the phone between an agent of a party and another person could be testified to by that other person with no hearsay problem if offered against the party as a result of the admission against a party opponent rule).

Next, Midwest ISO claims that the change in position was a mere transfer and therefore was not an adverse employment action as a matter of law.  The Supreme Court stated that to fulfill the adverse employment action prong of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in [the context of the anti-retaliation provisions of Title VII] means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).  The Seventh Circuit's approach to determining whether an employment action is materially adverse is a "flexible, practical" one and has "emphasized that an adverse employment action need not be quantifiable in terms of pay or benefits." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008).

Midwest ISO cites *Place v. Abbott Labs*, 215 F.3d 803 (7th Cir. 2000), for the purpose of showing that a transfer from a supervisory position to a non-supervisory position without an accompanying drop in pay is not a materially adverse employment action as a matter of law.  *Id.* at 809-10.  Midwest ISO's reliance on this case is misplaced because its facts are not analogous to the facts of Chamber's change in position.  The court considered

13

the dynamics of Abbot Labs, concluding that such a dynamic business could frequently involve shifting people from one job to another, and indeed, Place was shifted to a different project where her predecessor had a higher grade level than she did. *Id.* at 810. The court noted that there was room for Place to grow in the new position, and "[she] could not expect to jump into a new project at the top." *Id.* The court acknowledged in *Place* that the fact that one receives the same salary and benefits and holds the same title in her new position "does not necessarily preclude her retaliation claim, for adverse actions can come in many shapes and sizes." 215 F.3d at 810 (internal quotations omitted). In this case, Chambers had all of the human resources responsibilities removed from her plate, was given a less impressive title described as a demotion by her direct supervisor, Def.'s ex. 14, and apparently had the scope of her responsibilities limited to one project. *Id.* As a result, there is a genuine issue as to whether Midwest ISO's action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N.*, 548 U.S. at 68.

Chambers contends that her short term bonus potential was affected by her change in position. Chambers claims that to the extent she asserted her bonus potential would be cut in half as a result of her move in positions, she did so as a result of her own personal knowledge of her compensation scheme. Chambers is competent to testify to matters relating to her compensation, and the fact that she referred to a document in her explanation does not mean that her statements regarding the compensation scheme were hearsay. Midwest ISO may rely on the "Chart 3" document to which Chambers allegedly referred to rebut Chambers' claim that her short term bonus potential was affected by her change in position. Chambers cannot use the document as a sword to bolster her

14

testimony that her bonus potential was limited and then shield herself with the hearsay rule to prevent Midwest ISO from using the document to rebut her testimony.  Any conflict between the parties regarding whether Chambers' short term bonus potential was affected by her change in position is a question of fact for the jury.  This Court **DENIES** Chambers' Motion to Strike the document.

Finally, there is a genuine issue of material fact as to whether there is a causal connection between Chambers' alleged statutorily protected activity and the alleged adverse employment action.  Midwest ISO alleges that the facts conclusively show Chambers was disciplined only for the "tone and tenor" of both her March 29 and April 4 emails and not the substance of those emails.  Citing to *Jennings v. Tinley Park Cmty. Consol. Sch. Dist. No. 146*, 864 F.2d 1368 (7th Cir. 1988), Midwest ISO claims that even if the substance of the emails was protected, taking action against an employee for complaining in an unprofessional manner prevents any causal connection from forming between the alleged statutorily protected activity and the alleged adverse employment action.  However, here there is sufficient evidence to create a genuine issue of material fact as to why Doying disciplined Chambers.  The sequence of events leading to the disciplinary meeting - namely Chambers' alleged oral complaints to Doying, Volpe and Begley; the phone conversation between Doying and Volpe in which Doying allegedly expressed fears that Chambers was opening Midwest ISO up to a lawsuit, and his admonition that when Volpe returned from vacation they would have to "address the situation" together create a jury question as to why Doying disciplined Chambers.  As to Chambers' first claimed instance of retaliation, Midwest ISO's Motion for Summary Judgment is **DENIED**.

## B. CHAMBERS' RETALIATION CLAIM BASED UPON HER LEAVE AND TERMINATION

As to Chambers' second claim of retaliation, Midwest ISO does not dispute that the EEOC charge was a statutorily protected activity and further does not dispute that Chambers' termination was a materially adverse employment action.   Midwest ISO correctly states that the Seventh Circuit does not consider an employee's placement on paid administrative leave pending the completion of an investigation a materially adverse action. *Nichos v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007).  Additionally, Chambers waived any argument she might have in opposition by failing to address it in her response brief.  Thus, to the extent that Chambers made a claim of retaliation on the basis of her placement on paid administrative leave, Midwest ISO's Motion for Summary Judgment is **GRANTED**.

The only question remaining is whether there is a material question of fact regarding the causal connection between Chambers' charge of discrimination with the EEOC and her termination.  The Court finds that there is not.

Chambers relies heavily on the timing of the termination with respect to the date of her EEOC complaint to prove a causal link.  However, "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation of that filing will rarely be sufficient in and of itself to create a triable issue," *Stone v. City of Indianapolis Pub. Utils. Div.* 281 F.3d 640, 643 (7th Cir. 2002).  Indeed, in order to prove a causal link, the plaintiff "must put forth other evidence that suggest that the protected activities were related to the employer's decision." *Hall v. Forest River, Inc.*, 536 F.3d 615, 622 (7th Cir. 2008).

Chambers makes four other arguments to try to suggest that the protected activities were related to the employer's decision.  First, she cites the alleged phone call between Doying and Volpe immediately following the March 29, 2007, email, in which Doying said that the situation created by Chambers' complaint regarding Midwest ISO's failure to promote Ridley must be addressed.  That alleged conversation, however, focused on Chambers' complaint regarding Ridley not her charge with the EEOC that she was retaliated against.  It might bolster the link between her email and the change in her position, but its not enough to create an issue of triable fact as to her EEOC charge and termination.

Second, Chambers posits that a reasonable jury could conclude that Midwest ISO terminated her for discussing the confidential meeting with the EEOC.  However, this argument is not supported by anything in the record and "conjecture or speculation regarding the employer's motives cannot be used to defeat a summary judgment motion." *See Abioye v. Sunstrand Corp.*, 164 F.3d 364 (7th Cir. 1998).

Third, Chambers points to inconsistencies between Midwest ISO's Summary Judgment Brief and the position statement Midwest ISO prepared and submitted to the EEOC.  The inconsistencies surround the characterization of an alleged conversation between Davis Smith and Chambers regarding the April 16 meeting as well as whether Chambers spoke to more than one Midwest ISO employee regarding the April 16 meeting.  Chambers also goes to great lengths to show that Davis Smith had no knowledge of the April 16 meeting and, therefore, Chambers concludes that there is an issue of triable fact regarding Midwest ISO's real reason for her termination.  However, the record does not support the notion that Davis Smith had no knowledge of the April 16 meeting.  In fact,

17

Davis Smith testified that Chambers discussed a meeting with her in which Chambers had learned that there was a change in her position.  Pl.'s Ex. 30.

Ostensibly, Chambers points to these things as a way to illustrate potential pretext on the part of Midwest ISO when it claims that it terminated her for discussing the April 16 meeting with members of Midwest ISO's staff in violation of the confidentiality requirement. However, the record supports the idea that Chambers did discuss the April 16 meeting with at least one member of Midwest ISO's staff that was not supposed to be party to it.  Even if Chambers did not discuss the meeting with Davis Smith, Chambers has not presented any evidence to contest that Doying believed she had, Def.'s Ex. 5 at 14 (noting that told his superior prior to Chambers' termination that Chambers had failed to keep the contents of the meeting confidential); Def.'s Ex. 11 at 34, and an honest but mistaken belief by an employer that he has a valid reason for terminating an employee does not constitute retaliation.  *See Kariotis v. Navistar Int's Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997).

Finally, Chambers states that Midwest ISO did not follow its own procedures with respect to her termination.  She claims that Midwest ISO's policy required that an accused employee be interviewed as part of any investigation regarding the employee.  Chambers was never interviewed.  However, Chambers fails to identify any evidence in the record to indicate that Midwest ISO had any such policy in place.  Further, she cites *W.W. Grainger, Inc. v. NLRB*, 582 F.2d 1118, 1121 (7th Cir. 1978), to support her claim that Midwest ISO's failure to follow its alleged policy supports her allegation of a causal link between her EEOC charge and her termination.  Chambers' reliance on Grainger is misplaced, however, because it addresses a situation where the employer completely failed to investigate, and

18

in Chambers' case there is no indication by either party that Midwest ISO failed to do any investigation.

When taken together, all of these arguments, based on circumstantial evidence, fail to create a "convincing mosaic of discrimination against" Chambers.  *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  Thus, on the retaliation claim regarding Chambers' EEOC charge and her subsequent termination, Midwest ISO's Motion for Summary Judgment is **GRANTED**.

## C. PUNITIVE DAMAGES

In a certain subset of Title VII and § 1981 cases punitive damages are available.  "Punitive damages are limited, however, to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. ADA*, 527 U.S. 526, 529-30 (1999) (quoting 42 U.S.C. § 1981).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Id.* at 535.  The Seventh Circuit has described the *Kolstad* decision as a "three-part framework for determining whether an award of punitive damages is proper under the statutory standard."  *Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001).  "The first step requires the plaintiff to demonstrate that the employer acted with the requisite mental state."  *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 661 (7th Cir. 2001).   "A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's

19

policies for implementing those laws." *Id.* at 662.  Next, the plaintiff must "demonstrate that the employees who discriminated against [her] are managerial agents acting within the scope of their employment" *Id.*  Even if the plaintiff can meet these burdens, "the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy." *Id.*

As to the first prong, it is clear that Doying was aware of antidiscrimination laws not only from the published antidiscrimination policies in place at Midwest ISO, Def. ex. 1, but also because of his phone call to Volpe in which he allegedly said that Chambers statement in her email regarding the treatment of Ridley opened Midwest ISO up to potential liability. Pl.'s ex. 25.

Chambers also meets the second burden.  Although there is some dispute that it was Doying and not Volpe who actually took disciplinary action against Chambers, Chambers presents enough evidence to create a triable question of fact on the issue. *Compare* Pl.'s ex. 27 at 11 (alleging that Volpe was the sole decision maker regarding any disciplinary action taken against Chambers) *with* Pl.'s ex. 25 at 30 (alleging that Doying was the sole decision maker regarding any disciplinary action taken against Chambers).   If a jury found that it was Doying who took the disciplinary action against Chambers, there little doubt Doying was a managerial agent acting within the scope of his employment.  Doying is an officer of Midwest ISO and apparently had enough discretion to terminate Chambers.

The third question, whether Midwest ISO "engaged in good faith efforts to implement an antidiscrimination policy" is a closer one.  "This good faith exception rests on the notion that the existence and enforcement of an anti-discrimination policy shows that the employer itself never acted in reckless disregard of federally protected rights." *Lowery v. Circuit City*

20

*Stores, Inc.*, 206 F.3d 431, 445 (7th Cir. 2000).  However, "[e]very court to have addressed this issue thus far has concluded that, although the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award."  *Bruso*, 239 F.3d at 858; *id.* at 858 n.7 (collecting cases).  Midwest ISO did have formal antidiscrimination and antiretaliation policies published in its employee handbook, Def.'s ex. 1, and Chambers was aware of and followed those policies.  However, if a jury believed that Midwest ISO retaliated against Chambers, it could also reasonably believe that Midwest ISO violated its own antiretaliation policy by so retaliating.  *Cf. Id.* at 861.  Further, a jury might believe that Midwest ISO disregarded its own policy by failing to remedy or investigate any discrimination against Ridley.  Thus, Chambers raises triable questions of fact concerning whether she is entitled to punitive damages.  *See id.* at 861 (noting that where a "top management official" disregarded a formal zero-tolerance policy against discrimination a reasonable jury could conclude that the employer did not make a good faith effort to comply with Title VII despite its formal policy).  Therefore, on the issue of punitive damages, Midwest ISO's Motion for Summary Judgment is **DENIED**.

21

## IV. **CONCLUSION**

For the foregoing reasons, the defendant's, Midwest Independent Transmission System Operator, Inc., Motion for Summary Judgment is **DENIED in part and GRANTED in part**.

IT IS SO ORDERED this 7th day of June, 2010.


_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution to:

James F. Ehrenberg Jr.
BARNES & THORNBURG LLP
jehrenberg@btlaw.com

Denise K. LaRue
HASKIN LAUTER  & LARUE
dlarue@hlllaw.com

Robert Anthony Prather
BARNES & THORNBURG LLP
tony.prather@btlaw.com

Bradley L. Wilson
HASKIN LAUTER  & LARUE
bwilson@hlllaw.com

22